# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

RONALD L COSPER,                    )
                                    )
    *Petitioner*,              )
                                    )
v.                                  )    Case No. 1:21-cv-114
                                    )    Judge Atchley
JOHNNY FITZ,                        )    Magistrate Judge Steger
                                    )
    *Respondent*.             )
                                    )

## MEMORANDUM OPINION

Petitioner has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. §2254, challenging the constitutionality of his confinement pursuant to his Hamilton County convictions for first-degree felony murder in the perpetration or attempt to perpetrate a robbery and for attempted especially aggravated robbery [Doc.1]. After reviewing the parties' filings and the relevant state court record, the Court has determined that Petitioner is not entitled to relief under §2254, and no evidentiary hearing is warranted. *See* Rules Governing § 2254 Cases, Rule 8(a) and *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). For the reasons set forth below, the §2254 petition will be **DENIED**, and this matter will be **DISMISSED**.

### I.    BACKGROUND

On November 14, 2012, a Hamilton County Grand Jury indicted Petitioner for first-degree felony murder in the perpetration or attempt to perpetrate a robbery and for attempted especially aggravated robbery, related to a July 2012 attempted robbery where Steve Mosley was fatally shot [Doc. 7-1 p. 5-7].[1]

---

[1] Petitioner was likewise indicted for conspiracy to commit aggravated robbery; however, this charge was dropped before trial [Doc. 7-1, p. 7].

At trial, the evidence adduced suggested that Petitioner intended to rob the victim for money and marijuana and shot him during the commission of that attempted robbery. Chattanooga Police Officer Thomas Seiter testified that he was dispatched to the scene of the shooting of victim, Steve Mosley. *State v. Cosper*, No. E2016-00212-CCA-R3-CD, 2017 Tenn. Crim. App. LEXIS 371, at *3 (Tenn. Crim. App. May 12, 2017) (no perm. app. filed) (*"Cosper I"*). The victim was later confirmed to have suffered a blunt force injury to the scalp, various abrasions over his body, and gunshot wounds to the chest and abdomen. *Id.* at *10-11. At the scene, Officer Seiter interviewed Marquita Swanson and Jameka Price who described the suspect as a black male, about 5'9', wearing a turquoise shirt, and having a "low-cut haircut." *Id.* at *3.

Ms. Swanson, the victim's neighbor, testified that on the day of the shootings she was home with family members and had seen the victim that morning. *Id.* That afternoon, she heard loud noises coming from the victim's living room, which was unusual; when she looked into the victim's living room, she saw the victim "tussling with" another person over a revolver but could not see either person's face. *Id.* at *4. She returned to her own unit and heard four or five gunshots as she was entering. *Id.* After putting her children in the back of the house, she returned to her living room where she saw the victim holding his chest. *Id.* He showed her a gunshot wound, asked her to call his brother, fell to the floor crying, and died. *Id.* at *4-5.

Another resident of the victim's neighborhood, Cheryl Billups, who was also the victim's former girlfriend, testified that at the time of the shooting she was outside her daughter's home talking to neighbors. *Id.* at *5-6. She said she heard what sounded like fireworks, people screaming and crying, and children "hollering." *Id.* at *6. She saw people running through a "cut-through" trail and saw a white car pull up, driven by Dustin Hayes, with Devante Stoudemire in the passenger seat, and "Ronald Cosper as I know of today" in the back seat. *Id.* She conceded that

she did not know either Petitioner's or Mr. Hayes's name prior to talking to defense counsel but knew Mr. Stoudemire as he had attended school with her son. *Id.* at *6-7. She described Petitioner as being between 5'3" and 5'8" and wearing a turquoise blue t-shirt and black or navy shorts. *Id.* at *7. She said that both Mr. Stoudemire and Petitioner got out of the car and that Petitioner "went through the trail," while Mr. Stoudemire made small talk with her. *Id.* at *6-7. She also heard Mr. Stoudemire make a phone call in which he said "Yeah, man, yeah, you crazy. All right. It's done. . . .Okay." *Id.* at *7. Petitioner then returned to the car, nodded to Mr. Stoudemire, and they left. *Id.* Ms. Billups then reported hearing emergency vehicles. *Id.* Both Ms. Billups and the victim's brother confirmed that the victim sold and possessed a small amount of marijuana, which was supported by a search of the victim's house which uncovered marijuana and scales. *Id.* at *7-8.

Chattanooga Police Homicide Investigator Matthew Puglise testified that various residents of the apartment complex were taken to the police department for interviews and identified the perpetrator as a black male with "short low hair" wearing a turquoise sweater or sweatshirt. *Id.* at *12-13. During her interview Cheryl Billups provided Devante Stoudemire's name to investigators. *Id.* at *13. Mr. Stoudemire was subsequently interviewed by police and released after giving a statement. *Id.* During that interview, Mr. Stoudemire, who also went by the nickname "White Chalk," told police that he saw a man run from "the cut," and flag down and get into a white Buick driven by Dustin Hayes. *Id.* Investigator Puglise then identified Dustin Hayes through Facebook, whom he described as white, skinny, with long hair worn in a ponytail. *Id.* Mr. Hayes was then also interviewed and released after giving a statement. *Id.* at *13-14.

After three of Petitioner's fingerprints were found on the victim's screen door, the police sought out Petitioner, who voluntarily came to the department, waived his rights, and gave a

statement which was recorded.[2] *Id.* at *14. During this statement, Petitioner said that on the day of the shooting, he was in Hixson with his friend Blake Lee and received a call from his sister, who told him that someone had "died down the street." *Id.* Although he looked at Facebook, he did not find any information and did not know who died; after being told the victim's name, he said he did not recognize it. *Id.* at *14-15. Petitioner denied being in a white Bonneville or driving around with a white ponytailed male that day or having ever been at the victim's address. *Id.* at *15. He stated that after hearing that something happened in his neighborhood, he decided to stay in Hixson. *Id.* The next morning, he had missed calls and was alerted that the police had been to his home and were looking for him. *Id.* at *15-16.

Petitioner denied knowing Devante Stoudemire but did say he had seen him on the news; when shown a photo, he said he had gone to school with the person whom he identified as "White Chalk." *Id.* at *16. He denied knowledge of a 2007 event where he was interviewed by police when he was with Devante Stoudemire. *Id.* He also denied knowing Dustin Hayes or being with him on July 2. *Id.* at *17. When shown a picture of the victim, he said he had never seen him before or been to his house. *Id*. While Petitioner admitted smoking marijuana, he denied knowing where to get it and said he had not purchased marijuana from the victim. *Id.* When told that his fingerprints were found at the victim's home, Petitioner admitted purchasing marijuana there the previous Saturday, which he said was not the first time, but denied being there on July 2. *Id.* at *18. He claimed he originally did not disclose this because he "didn't want to get in trouble for smoking weed." *Id.* at *18-19. When told his fingerprints were on Mr. Hayes's car, he said that he had probably seen him at Blake Lee's house but did not really know Mr. Hayes. *Id.* at *19. He admitted

---

[2] This recording was played for the jury.

4

that he was in the car with Mr. Hayes to go to Hixson but denied picking up Mr. Stoudemire. *Id.* He denied knowing of or being on a path across the street from victim's house. *Id.*

He admitted there had probably previously been ammunition in his room but said there "should not be" any there currently. *Id.* at *16. When questioned regarding the .38 caliber spent shell casings under his mattress at home, Petitioner said he did not know anything about a .38 caliber gun and did not own one. *Id.* at *20. Petitioner declined to give a DNA sample and denied firing a weapon but did admit to handling fireworks and said that he wore the same clothes at the time of the interview that he had worn the day before.[3] *Id.* at *21.

During Petitioner's interview with the police, his mother and brother walked in. *Id.* Petitioner's mother questioned him, including asking him about "the white boy," and among other things, Petitioner told her that he had been with "Blake, Marcus, and Trey" the previous day; his mother stated she had talked with "Michelle" and that "they ain't been there." *Id.* at *21-22. Petitioner, however, contended that he had been and that "Ms. Michelle" knew so. *Id.* at *22-23.

Investigator Puglise said that after Petitioner's interview, Mr. Stoudemire and Mr. Hayes were again interviewed and were each charged with felony murder. *Id.* at *23. Investigator Puglise said Mr. Hayes took him to a location where the shell casings were disposed of; there they found three .32 caliber shell casings in a storm drain. *Id.* No weapon was recovered. *Id.* at *24. Investigator Puglise said that both Mr. Hayes and Mr. Stoudemire agreed that the motive for the crime was to get marijuana and money. *Id.* at *25.

---

[3] Petitioner's clothes were tested by TBI Special Agent Forensic Scientist Chad John, who testified that he found a blood stain on Petitioner's shorts which contained a mixture of DNA from at least two unidentified individuals. *Cosper I*, at *42-43. Another Special Agent, James Russell Davis II, reported that Petitioner's shorts also had gunshot primer residue on them, which was not consistent with fireworks. *Id.*

5

Mr. Hayes testified at trial that he had been charged with first degree felony murder and had pleaded guilty to facilitation of aggravated robbery relative to these events. *Id.* at *30. He acknowledged that he had agreed to a six-year sentence but had not yet been sentenced. *Id.* He also acknowledged that his plea agreement included a provision that he would testify truthfully in any proceedings involving Petitioner or Mr. Stoudemire relative to the victim's homicide and would cooperate with law enforcement and the district attorney's office. *Id.* at *30-31.

Mr. Hayes testified in detail about the events. He said he had known the Petitioner since they were both 15, and that he was now 21 and good friends with Blake Lee, who also knew the defendant. *Id.* at *31. He testified that the three had spent Saturday June 30 and Sunday July 1, 2012 together at Mr. Lee's house and remained together on July 2. *Id.* On July 2, he claimed that the group woke up, smoked marijuana, watched a movie, and played video games. *Id.* at *32. He likewise reported that Petitioner wore a blue or turquoise Angry Birds shirt and dark shorts. *Id.* Throughout the morning, Petitioner began asking for a ride and Mr. Hayes believed Petitioner's intent was to commit a robbery to obtain money and marijuana. *Id.* at *32-32. He testified that while he initially delayed, he eventually gave Petitioner a ride. *Id.* at *33. They first went to an apartment complex for Petitioner "to pick up some heat," referring to a weapon, where Mr. Stoudemire entered the car. *Id.* Mr. Stoudemire asked "what's up," and Petitioner "said something about a lick that we were going to go hit," referring to committing a robbery or burglary. *Id.* Petitioner then directed Mr. Hayes to drive towards North Hawthorne Street, which Mr. Hayes did, but Mr. Stoudemire directed him to a different street than "the actual scene." *Id.* Mr. Stoudemire gave Petitioner a dark-colored revolver, went to talk to some women nearby, and Petitioner disappeared into a "cut." *Id.* at *33-34.

Mr. Hayes then heard three loud bangs and said that Mr. Stoudemire yelled "fireworks." *Id.* at *34. Petitioner returned through the cut, got into the car, and told him to "go." *Id.* Mr. Stoudemire also got into the car. *Id.* Mr. Hayes said Petitioner then stated that things had gone wrong when the victim attacked him and tried to grab the gun; Petitioner said he shot the victim in order to get the victim off him. *Id.* at *34-35. They drove to another home where Petitioner went inside. *Id.* Mr. Stoudemire walked to a stop sign about ten feet ahead, wiped the shell casings with a bandana, and dropped the casings into a drain. *Id.* at *35. At some point, Petitioner spoke on his cell phone and told the person on the other end that he had to "burn," which meant shoot, the victim. *Id.* at *35-36. The three men went to another home, and after some time there, left to go to Mr. Lee's house. *Id.* at *36. Later, Mr. Stoudemire got a phone call and said that Mr. Stoudemire's name had been mentioned in connection with a shooting, and that the person had also seen someone in a blue shirt get out of the car and "disappear," but Mr. Stoudemire did not think Mr. Hayes name had been mentioned. *Id.* Mr. Stoudemire later advised Mr. Hayes to say, "I don't know him, I don't know Ronnie and I don't know s---," if questioned. *Id.* at *37.

Later that evening police came to Mr. Hayes house and took him to the police department for an interview. *Id.* While he initially declined to talk to the police, after several hours in handcuffs and shackles and seeing Mr. Stoudemire walking out of the police department "very happy looking," Mr. Hayes changed his mind. *Id.* at *38. However, even when he began talking, he tried to distance himself "as much as possible" and did not acknowledge Petitioner's involvement. *Id.* He did not identify Petitioner, or anyone else, at the person who rode along with he and Mr. Stoudemire and committed the murder. *Id.* He went along with Mr. Stoudemire's statement so Mr. Stoudemire would not get mad or hurt him. *Id.* at *38-39. After being released, he told Mr. Lee

what he had told the police. *Id.* at *39. He also told Petitioner "some guy named Rodney did something." *Id.* at *39.

On July 3, Mr. Hayes again was interviewed and gave a statement at the police department. *Id.* He initially denied knowledge of the relevant events but progressively provided more information. *Id.* at *39-40. He was afraid to admit he had seen a gun and told police it had been "wrapped up." *Id.* at *40. He agreed to take police to where shell casings were dropped. *Id.* He cooperated with the investigation at this point and had not been offered a plea agreement and did not have an attorney. *Id.* On cross-examination, Mr. Hayes acknowledged that he just agreed with all the facts provided by police during his interviews. *Id.* He agreed that he was repeatedly threatened with charges to the crimes that he was ultimately charged with committing. *Id.* He acknowledged that in his third statement he told them Ronnie, not Rodney, participated. *Id.* at *40-41.

The jury convicted Petitioner on both charges [Docs. 7-1 p. 108; 7-2 p. 31]. Petitioner was automatically sentenced to life imprisonment for felony murder, and following a sentencing hearing, received a concurrent ten-year sentence for his attempted especially aggravated kidnapping charge. *Cosper I*, 2017 Tenn. Crim. App. LEXIS 371, at *2. Petitioner filed a direct appeal to the Tennessee Court of Criminal Appeals ("TCCA"), contending that the evidence was insufficient to support his convictions, challenging the corroboration of his accomplice's testimony, and contesting a witness's identification of Petitioner as the perpetrator at trial [Doc. 7-15]. The TCCA affirmed, noting that the evidence was sufficient to support Petitioner's conviction and that his claim regarding the witness identification was waived [Docs. 7-17, 18]. *Id.*

In May of 2018, Petitioner filed a post-conviction petition, which was likewise denied. In his subsequent appeal to the TCCA Petitioner argued that counsel was ineffective for: (1) not

8

challenging the admissibility of a witness's identification of Petitioner as the perpetrator; (2) failing to impeach witnesses with their prior inconsistent statements; (3) failing to request jury instructions which included lesser offenses of facilitation and solicitation; (4) failing to call alibi witnesses; (5) failing to request a mistrial or instruction regarding the mention of Count 3 of the indictment in the preliminary jury instructions; (6) failing to object to the use of the co-defendant's alias at trial; (7) failing to object to the prosecutor's improper statements made during closing arguments; and (8) not challenging the prosecution's failure to honor his plea agreement [Doc. 7-23]. On October 27, 2020, the TCCA denied Petitioner's appeal, finding that counsel was not ineffective [Doc. 7-26]. *Cosper v. State*, No. E2020-00024-CCA-R3-PC, 2021 Tenn. Crim. App. LEXIS 30, at *1 (Tenn. Crim. App. Oct. 27, 2020) (no perm. to appeal file) ("*Cosper II*").

Petitioner then filed his federal habeas petition on May 25, 2021 [Doc. 1]. The Court ordered Respondent to file an answer specifically addressing timeliness and exhaustion, which the Respondent did [Doc. 10].[4] This matter is now ripe for review.

## II.     STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. §2254, a district court may not grant habeas-corpus relief for a claim that a state court adjudicated on the merits unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

---

[4] Respondent expressly did not challenge the timeliness of Petitioner's petition, citing *Holbrook v. Curtin*, 833 F.3d 612 (6th Cir. 2016) (concluding that tolling under 28 U.S.C. §2244(d)(2) continues during time when petitioner could have, but did not seek discretionary review from state supreme court on collateral review).

28 U.S.C. § 2254(d)(1), (2). This standard is intentionally difficult to meet. *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quotation marks omitted). A district court may only grant habeas relief under the "contrary to" clause if the state court decides a question of law or a materially indistinguishable set of facts conversely to the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). To grant habeas relief under the "unreasonable application" clause, the Court must find that the state court's decision was an "objectively unreasonable," and not simply an erroneous or incorrect, application of the correct legal principle to the facts. *Id.* at 409-11. The AEDPA likewise requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). When the record supports the state court's findings of fact, those findings are entitled to a presumption of correctness which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In addition to the stringent standard for succeeding on the merits of a claim, the grant of habeas relief is further restrained by exhaustion requirements and the doctrine of procedural default. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In order for a claim to be considered on habeas review, the petitioner must first exhaust state remedies for that claim. 28 U.S.C. §2254(b)(1). Exhaustion requires a petitioner to "fairly present," each federal claim to all levels of the state appellate system, meaning he presented the "same claim under the same theory" up to the state's highest court, *Wagner v. Smith*, 581 F.3d 410, 414, 418 (6th Cir. 2009), to ensure that states have a "full and fair opportunity to rule on the petitioner's claims," *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990); *see O'Sullivan*, 526 U.S. at 842. Tennessee has determined that presentation to the TCCA will satisfy the requirement of presentation to the state's highest court. Tenn. S. Ct. R. 39. If a claim has never been presented to the highest available state court and is now barred from such presentation by a state procedural

rule, that claim is procedurally defaulted and barred from federal habeas review. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Procedural default may also occur when a petitioner presented the claim to the highest court, but the state court was prevented from "reaching the merits of the petitioner's claim" because petitioner failed to comply with an applicable state procedural rule, which is regularly enforced and is an "adequate and independent" state ground. *Id.* (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)); *Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84–87 (1977)).

## III. ANALYSIS

In his petition, Petitioner raises ten claims all related to the ineffective assistance of counsel. Specifically, he claims counsel (1) failed to adequately meet and confer with petitioner; (2) failed to enter into meaningful plea negotiations; (3) failed to challenge the admissibility of a witness's in-court identification of Petitioner; (4) failed to impeach State witnesses with prior inconsistent statements; (5) failed to request jury instructions on facilitation and solicitation; (6) failed to present alibi witnesses; (7) failed to move for a mistrial or ask for a curative instruction regarding an erroneous charge mentioned in preliminary jury instructions; (8) failed to object to the use of his co-defendant's nickname at trial; (9) failed to object to improper remarks in the State's closing argument; and (10) failed to challenge the State's failure to honor Petitioner's plea agreement [Doc. 1]. Respondent contends that Petitioner's first claim is procedurally defaulted and not entitled to review, and that Petitioner is not entitled to relief on the merits of his other claims. The Court agrees; Petitioner is not entitled to habeas relief.

To successfully prove that counsel was constitutionally ineffective, a defendant must establish: (1) that counsel's performance was deficient such that he was no longer "functioning as the 'counsel' guaranteed under the Sixth Amendment," and (2) that counsel's "performance

prejudiced the defense . . . so as to deprive the defendant of a fair trial" and undermine the reliability of trial results. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficiency, the defendant must show "that counsel's representation fell below an objective standard of reasonableness," and was "outside the wide range of professionally competent assistance." *Id*. at 688. Counsel's performance is given broad deference and is not deficient where it simply "deviate[s] from best practices of most common custom," but rather, only where it amounts to incompetence. *Harrington v. Richter*, 562 U.S. 86, 104-05 (2011). To prove prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In other words, counsel's errors were sufficient to undermine confidence in the outcome and petitioner has been deprived of a fair trial. *Id.* at 687. Where a court fails to find one element, it need not consider the other. *Id.* at 697.

The Supreme Court has clarified that when a federal court reviews a state court's application of *Strickland*, which sets its own high bar for claims, "establishing that a state court's application was unreasonable under §2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "In those circumstances, the question before the habeas court is 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Id.*; *see Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA").

### A. Contact and Preparation with Petitioner

Petitioner first claims that "trial counsel failed to adequately meet and confer with Petitioner prior to trial, explain the defense theory to him, and prepare him for his testimony at

trial" [Doc. 1 p. 15]. Respondent contends that this claim is procedurally defaulted because it was not presented to the state court, and that Petitioner is not entitled to relief from his default because his claim is not substantial [Doc. 10 p. 44]. Petitioner neither addresses the procedural default of this claim or argues any form of cause or prejudice. The Court indeed agrees that this claim is procedurally defaulted; however, rather than consider every facet of cause and prejudice analysis, the Court instead rejects Petitioner's claim on its merits, as permitted by the Supreme Court. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (holding that federal courts are not required to address procedural default before denying a claim on its merits); *see also Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003) (finding that the Court need not address procedural default, where such question was complicated and ultimately unnecessary to the court's determination of the case). The Court finds that Petitioner is not entitled to relief on this claim.

Petitioner provides only an issue statement, quoted above, regarding this claim; he has provided no argument as to why or how trial counsel's contact with him was deficient or how he was prejudiced by counsel's alleged deficiency. Looking to the record, at Petitioner's post-conviction hearing, trial counsel testified that he was the third attorney appointed to Petitioner's case and was appointed five months before Petitioner's trial. *Cosper II*, 2021 Tenn. Crim. App. LEXIS 30, at *3. During that time, he met with Petitioner's prior counsel, worked with the investigator that prior counsel had used, completed a "thorough review" of the discovery materials, met with Petitioner at least fifteen times, interviewed all three State's expert witnesses and reviewed their reports, interviewed the State's witnesses who were willing to talk with him, and attempted to locate potential alibi witnesses. *Id.* at *3-4.

Moreover, while Petitioner contends that counsel did not prepare him for testimony at trial, the record reflects that Petitioner did not testify at trial and his in-court assertions undermine that

counsel did not discuss that decision with him. When the trial court asked whether Petitioner had decided to testify, Petitioner stated that he would not [Doc. 7-8 p. 49]. Trial counsel indicated that he had not discussed "the Momon proceeding," *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), with Petitioner and trial proceedings went off the record to allow trial counsel and Petitioner to confer [*Id.*]. Upon return, counsel confirmed that he had discussed Petitioner's decision to testify before that day and that during their in-court conferral, he had explained to Petitioner that he must state this decision under oath [*Id.*]. Petitioner then testified, under oath, that he and counsel had discussed his decision whether to testify multiple times prior to that day, that trial counsel had explained it was Petitioner's decision alone, and that they had discussed the consequences of Petitioner testifying [*Id.* at 50]. Petitioner then stated he would not be taking the stand [*Id.*]. The trial court then engaged in its own colloquy with Petitioner where Petitioner confirmed understanding it was his right to testify or not and the decision was his alone to make [*Id.* at 51-52]. Petitioner likewise confirmed that he had discussed his decision with counsel prior to that day and felt that he understood what he was doing [*Id.* at 52]. Petitioner reiterated that he was choosing not to testify [*Id.*].

However, at later post-conviction hearings, Petitioner testified that he wanted to testify, but trial counsel advised him that it was not a good idea [Doc. 7-20 p. 152]. He stated that he wanted to "establish why I was hesitant or didn't necessarily initially speak truthfully about certain things to the law enforcements. It was because my experience with law enforcements [sic]" [*Id.* at 153-54]. He later conceded that he remembered the judge asking if he wanted to testify, telling him that it was his own choice, and choosing not to testify [*Id.* at 155].

Simply put, Petitioner's claim is meritless. Petitioner has offered no significant factual or legal support for this argument, and indeed the record and Petitioner's own assertions undermine

the allegations he now makes. This sort of generalized, conclusory allegation cannot establish a meritorious claim of ineffective assistance of counsel and Petitioner is not entitled to relief. *See Wogenstahl v. Mitchell*, 668 F.3d 307, 335-36 (6th Cir. 2012) (holding "general claims of [ineffective assistance of trial counsel] are insufficient to overcome the presumption of reasonable professional assistance and are insufficient to warrant habeas relief); *United States v. Crosgrove*, 637 F.3d 636, 663 (6th Cir. 2011) (holding "conclusory assertions of ineffective assistance are not adequate.").

Even if Petitioner had offered factual support for his claim that counsel's conference with Petitioner was inadequate, the Sixth Circuit has clarified that such claims fail absent a showing of how counsel's additional or longer meetings "would have led to new or better theories of advocacy or otherwise would have created a 'reasonable probability' of a different outcome." *Hill v. Mitchell*, 400 F.3d 308, 324-25 (6th Cir. 2005); *see also Bowling v. Parker*, 344 F.3d 487, 506 (6th Cir. 2003) (finding that Bowling failed to demonstrate how additional meetings would have affected the outcome of his trial). As Petitioner cannot demonstrate prejudice under this framework, his claim fails.

Petitioner's claim that counsel failed to "prepare him for testimony," is likewise meritless. It is unclear what claim Petitioner is attempting to raise here as he, in fact, gave no testimony for which trial counsel could have prepared him. If instead Petitioner is attempting to challenge counsel's failure to discuss Petitioner's right to testify with him, the record belies Petitioner's claim. Petitioner testified, under oath, at trial that counsel had discussed his right to testify with him prior to trial and that it was Petitioner's own decision not to testify. Moreover, Petitioner failed to raise this claim in either his direct appeal or post-conviction petitions. Finally, Petitioner has not shown any resulting prejudice from his decision not to testify. Accordingly, this claim fails. *See*

*Lambert v. Settles*, No. 3:17-cv-01005, 2019 U.S. Dist. LEXIS 237183, at *55-56 (M. D. TN. Jan. 9, 2019) (holding that where Petitioner testified on the record that he was waiving his right to testify after discussing the decision with counsel for weeks, failed to raise his dissatisfaction for having not testified to the state courts, and did not show prejudice from having not testified that such claim of ineffective assistance of counsel was meritless).

### B. Plea Negotiations

Petitioner alleges in his second claim that counsel failed to enter into meaningful plea negotiations with the State and secure a favorable plea for Petitioner, while simultaneously alleging in claim ten that counsel failed to challenge the State's "reneging" on his plea agreement. In Petitioner's post-conviction appellate brief, he raised this claim as one that counsel was ineffective in "not challenging prosecutor's failure to honor [the] plea agreement," and argued that trial counsel was ineffective in failing to request a continuance when the plea offer drafted by counsel was rejected by the State [Doc. 7-23 p. 27-28]. It is unclear here whether Petitioner is attempting to raise only the claim he included below or is attempting to raise an additionally procedurally defaulted claim regarding his plea negotiations. While "fair presentation does not require word-for-word replication," *Bray v. Andrews*, 640 F.3d 731, 735 (6th Cir. 2011), a petitioner still must present the same claim under the same theory to the state courts before raising it on federal habeas," *Hicks*, 377 F.3d at 552-53 (6th Cir. 2004) (internal citation and quotation marks omitted). "To the extent that an ineffective assistance of counsel claim is based upon a different allegedly ineffective action than the claim presented to the state courts, the claim has not been fairly presented to the state courts." *Carver v. Straub*, 349 F.3d 340, 346-47 (6th Cir. 2003). However, in favor of judicial expediency, the Court again opts to deny this claim on its merits,

16

rather than address Petitioner's potential procedural default, particularly as Petitioner's claims are plainly meritless. *See Lambrix*, 520 U.S. at 525.

Petitioner's counsel testified that the State never offered Petitioner a plea agreement and told counsel that it had no intention of doing so. *Cosper II*, 2021 Tenn. Crim. App. LEXIS 30, at *4. Despite counsel's advice that Petitioner make a reasonable offer to the State in advance of trial, Petitioner waited until the evening before trial to make an offer. *Cosper II*, 2021 Tenn. Crim. App. LEXIS 30, at *4.

> Trial counsel said that the State never made a plea offer to the petitioner. The prosecutor had told counsel that the State had no intention of offering a plea agreement but would consider a "reasonable offer" from the petitioner. He stated that approximately one month prior to trial, the petitioner asked if the State would be willing to let him plead guilty to reckless homicide to which counsel explained that the State would not "be in a position to do a reckless homicide" in a first degree murder case. He advised the petitioner to consider offering the State a plea agreement of second degree murder. One day before trial, the petitioner "signed off on" a plea offer to second degree murder with a 20-year sentence. Trial counsel stated that he "immediately" took the offer to the prosecutor, but that night the prosecutor rejected the offer, stating that he would "take this case to trial." Counsel said that he believed that the petitioner understood that no deal had been struck at the time he authorized the plea offer.

*Id.* Petitioner, however, testified at post-conviction hearings that he believed the twenty-year agreement he signed had been offered by the State. *Id.* at *14. Petitioner originally asked counsel about offering to plead guilty to reckless homicide, which counsel told him would "never happen" [Doc. 7-20 p. 93]. On the Friday before trial, counsel asked if he would plead guilty to thirty years and indicated that "[i]t was out of the question" [*Id.* at 94, 98]. Petitioner testified that counsel said "Ronald, just think about it… you know, a deal have no [sic] never been offered… I wouldn't want to see you go to jail for the rest of your life" [*Id.*]. Counsel suggested thirty years, Petitioner proposed fifteen years, and after much "back-and-forth," they submitted an agreement to the State for a twenty-year sentence [*Id.* at 94-95, 98]. Petitioner indicated that at the time of this discussion, counsel was typing on a computer

as Petitioner would suggest sentence lengths and Petitioner believed counsel was conferring with the prosecution by e-mail [*Id.*]. Petitioner claims that he believed this offer was extended by the State because he "wouldn't have been willing to" make an offer to the State; however, counsel returned and told him that the State did not take the offer [*Id.* at 95-96]. Petitioner testified that he had already made preparations because he believed he was taking a plea deal [*Id.* at 96]. He further alleged that he did not "know at the time [he] could have brought it up in court, but [counsel] kept saying, 'it won't matter, it wasn't officialized in front of a judge, so it's like it never happened'" [*Id.* at 99].

The post-conviction court accredited trial counsel's testimony that the State did not make a plea offer and that counsel advised Petitioner "not to leave a reasonable plea offer until the eve of trial" [Doc. 7-19]. The TCCA likewise found that this claim had no merit. *Cosper II*, 2021 Tenn. Crim. App. LEXIS 30, at *26. It noted that the trial court had accredited trial counsel's testimony over Petitioner's and found that the State had made no plea offer to Petitioner. *Id.*

Petitioner cannot show that the state court objectively unreasonably applied *Strickland* or that its decision was based on an unreasonable determination of the facts. The record demonstrates that the State had indicated it had no intention to offer Petitioner a plea deal and did not, in fact, offer Petitioner a plea. After the State indicated that it may entertain a reasonable agreement offered by Petitioner, counsel encouraged Petitioner to make such an offer within a reasonable time frame. Petitioner declined to do so. When Petitioner finally agreed, just three days before trial began, counsel promptly took his offer to the State, who promptly rejected it. Petitioner has certainly not offered clear and convincing evidence to rebut the state court's finding that no plea agreement was offered to Petitioner. Moreover, while not directly addressed by the state court, Petitioner has not offered clear and convincing evidence that it was counsel's decision not to pursue a plea negotiation, rather than attributable to the State and Petitioner. Given the broad deference afforded to both counsel's performance and the state court's factual findings, and

because counsel could neither compel the State to make or accept a plea agreement, Petitioner has shown neither deficiency nor prejudice, and is not entitled to relief.

### C. In-Court Identification of Petitioner

Petitioner claims that trial counsel was ineffective for failing to challenge Cheryl Billups's in-court identification of Petitioner [Doc. 1 p. 15]. Although Petitioner provides no argument here, his state court argument rested on the premise that this identification was unreliable and thus inadmissible, under *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).[5] Specifically, in his post-conviction appeal, Petitioner claimed that trial counsel "should have objected to Ms. Billups's testimony that Mr. Cosper was one of the three men she identified as being involved," because she never made a positive identification pre-trial, lacked personal knowledge to identify Petitioner, and was not asked to identify Petitioner at trial [Doc. 7-23 p. 17]. Petitioner also contended that Ms. Billups's description "differs from Mr. Cosper in that she stated that the man she saw was between 5'3" and 5'8" when in fact Mr. Cosper is much taller" [*Id.*]. Respondent contends that Petitioner has presented no argument on what grounds counsel could have used to exclude this testimony and that the state court's reasoning was not objectively unreasonable [Doc. 10 p. 48].

While Cheryl Billups was interviewed by police, she did not testify at any pre-trial hearings. At trial, Ms. Billups testified that on the day of the incident, she saw a white car "and in that white car was a white guy and two black guys, and one of the guys was Ronald Cosper as I know today." *Cosper I*, 2017 Tenn. Crim. App. LEXIS , at *6. She acknowledged Petitioner as the person who went through the cut-through trail. *Id.* On cross-examination, Ms. Billups

---

[5] Notably, in is appellate brief, Petitioner argues the invalidity of the identification under *Neil v. Biggers* but seems to concede that Ms. Billups's in-court statement was not an in-court identification. *See* Doc. 7-23 p. 17-18 ("Even if Ms. Billups had made an in-court identification of Mr. Cosper, that identification would still have been objectionable under *Neil v. Biggers*.")

acknowledged that she only knew Petitioner's name through legal proceedings and did not know of him before then. *Id.* at *7. She also said that she had previously described him as being between 5'3" and 5'8". *Id.*

At post-conviction hearings, trial counsel testified that he recognized that Ms. Billups was the only eyewitness who could have identified Petitioner as the perpetrator other than Mr. Hayes or Mr. Stoudemire. *Cosper II*, 2021 Tenn. Crim. App. LEXIS 30, at *5. He said that he was surprised the State did not have Ms. Billups identify Petitioner in court and attempted to question her in a way that "tried to elicit the things that helped the defense without prompting an identification." *Id.* at *5-6. The TCCA summarized trial counsel's testimony:

> Trial counsel stated that Cheryl Billups, a key State witness, was unwilling to talk with him or his investigator when they had attempted to interview her, but the State arranged for him to interview Ms. Billups shortly before trial to avoid a voir dire of her testimony. Counsel said that, up until that point, he believed Ms. Billups' testimony would be key to establishing the petitioner's identity as one of the perpetrators but did not know the basis for her knowledge or what evidence her testimony would reveal. He knew from discovery materials that Ms. Billups had not identified the petitioner to law enforcement and had not been asked to identify a perpetrator from a photographic array, but counsel expected the State to ask Ms. Billups to identify the petitioner in court because she had previously identified him by name to prosecutors. Counsel also suspected that Ms. Billups had identified the petitioner as a perpetrator only because he was identified as the defendant in the case and not because she knew him from the events she witnessed. He stated that at trial, the State did not elicit an in-court identification from Ms. Billups, which put him "in a very precarious position" of wanting to emphasize the fact that Ms. Billups could not identify the petitioner without "eliciting the identification that the State had failed to make." He acknowledged that he did not move to suppress Ms. Billups' identification of the defendant but said that, at trial, Ms. Billups described the man she saw as being much shorter than the defendant, and she said that she only knew of the defendant's identity because she had seen his name on a subpoena.

*Id.*

The post-conviction court found that the State did not elicit an identification of the perpetrators at trial and that Petitioner then identified "no ground for counsel to move to suppress

20

Ms. Billup's eyewitness testimony." *Id.* at *20. Affirming, the TCCA applied *Strickland* and found that Petitioner was not prejudiced by Ms. Billups' use of Petitioner's name during her testimony. *Id.* at *26. Specifically, the court found that while Ms. Billups did use Petitioner's name several times, trial counsel also elicited on cross-examination that Ms. Billups did not know Petitioner at the time of the events and only identified Petitioner after he was charged and highlighted this fact in his closing argument. *Id.* Finally, the Court found that there was other evidence which corroborated her testimony that Petitioner was near the scene at the time of the shooting, and that Petitioner could not then prove prejudice. *Id.* at *27.

The Court cannot find that the state court's holding was contrary to or an unreasonable application of federal law or that it was based on an unreasonable factual determination. While the Supreme Court has decided that due process prohibits the introduction of "an unreliable identification obtained through unnecessarily suggestive procedures," *Moore v. Illinois*, 434 U.S. 220, 227 (1977), the state court found, based on counsel's testimony and its review of the record, that Ms. Billups did not in fact make an identification. Absent any argument by Petitioner, it remains unclear how this testimony could then have been suppressed. *See Henderson v. Bell*, 2014 U.S. Dist. LEXIS 371, *51 (E. D. Mich. Oct 27, 2014) (holding "trial counsel's failure to move to suppress an allegedly unreliable in-court identification is not ineffective assistance, absent a reasonable probability that this motion would have resulted in a decision to exclude the testimony.") (*internal citations omitted*). Moreover, counsel's decision to challenge Ms. Billups's testimony through cross-examination, as opposed to attempting to suppress her testimony, was a reasonable trial strategy that the Court will not second-guess. *Strickland*, 466 U.S. at 690-91.

### D. Failed to impeach witnesses

Petitioner next claims that trial counsel was ineffective for failing to impeach the prosecution's witnesses with their prior inconsistent statements [Doc. 1 p. 15]. Petitioner provides no argument to support this claim or clarification as to which witnesses counsel failed to properly impeach, but the Court presumes that Petitioner is raising the same claim here that he raised to the state courts below. There, he challenged that counsel failed to impeach both his co-defendant, Dustin Hayes, and witness Cheryl Billups, regarding their prior inconsistent statements [Doc. 7-23 p. 18-20]. Respondent alleges that counsel made strategic decisions in his cross-examination of these witnesses which are not for the Court to second-guess [Doc. 10 p. 49-50]. The Court finds that Petitioner is not entitled to relief.

Dustin Hayes, who was alleged to be with Petitioner on the day of the shooting, gave three separate statements to police and testified at Petitioner's trial implicating him in the murder. *Cosper I*, 2017 Tenn. Crim. App. LEXIS 371, at *13-14, 23, 30-32. At a hearing on Petitioner's post-conviction petition, trial counsel conceded that discrediting Mr. Hayes's testimony was important to the defense, as the only other evidence linking Petitioner to the scene were his fingerprints found on the door and the potential gunshot residue found on his shorts, and stated that he decided to do so by pointing out the favorable plea agreement Mr. Hayes had received in exchange for his testimony. *Cosper II*, 2021 Tenn. Crim. App. 30, at *6-7. He testified that:

> [H]e did not play the recordings of Mr. Hayes's statements during the trial but explained that the third of the statements was largely consistent with his trial testimony, and counsel feared that suggesting that the first two statements were untruthful would reinforce the truthfulness of the third statement and his trial testimony. Counsel said that he decided to impeach Mr. Hayes by emphasizing to the jury that Mr. Hayes received a "really great deal" from the State in exchange for his testimony.
>
> …

> Trial counsel stated he strategically cross-examined Mr. Hayes about the prior inconsistent statements he made to police while carefully avoiding "eliciting anything that would help the State by unintentionally asking the wrong question."

*Id.*

Petitioner properly exhausted this claim in his post-conviction appeal to the TCCA. There, he claimed that the weight of the testimony of Dustin Hayes and Cheryl Billups, detailed above, was significant as it "placed Mr. Cosper in the area at the same time as the murder and was the only evidence, other than accomplice testimony, directly implicating Mr. Cosper" [Doc. 7-23 p. 18-20]. The TCCA held that counsel was not ineffective for failing to impeach the State's witnesses. *Id.* at 24. Pertaining to Mr. Hayes, the court found that while counsel made a reasonable strategic decision not to introduce the recordings of Petitioner's prior statements which he believed could bolster Mr. Hayes's testimony, counsel did thoroughly impeach Mr. Hayes with these statements during cross-examination. *Id.* The TCCA found Petitioner's challenge to counsel's impeachment of Ms. Billups was likewise not grounds for relief. *Id.* at *25. While Petitioner argued that Ms. Billups prior testimony indicated a shorter individual than Petitioner, Ms. Billups had not testified at any pre-trial hearings, and her description of the perpetrator's height on cross-examination was consistent with her prior statement to police. *Id.* Therefore, the court found Petitioner did not demonstrate deficient performance by counsel on this matter. *Id.*

The Court, again, cannot find that the state court's holding was contrary to or an unreasonable application of federal law, nor that it involved unreasonable factual findings. Counsel's performance is afforded broad latitude and is only deficient when it falls below an objective standard of reasonableness and amounts to incompetence. *Strickland*, 466 U.S. at 687-88. Such deficient actions prejudice a petitioner only where there is a substantial likelihood of a

different result had counsel taken a different action. *Richter*, 562 U.S. at 112. Here, counsel made reasonable, strategic decisions regarding cross-examining the State's witnesses and was not then deficient. As stated above, counsel was successful in eliciting testimony from Cheryl Billups regarding her previous statement to police. Moreover, Petitioner has not provided, nor has the Court uncovered, how her testimony differed from her statement to police. Counsel elected to impeach Mr. Hayes by undermining the credibility of his in-court statements by demonstrating the favorable deal he had entered into with the State. Nor has Petitioner shown prejudice – that it is reasonably likely that the outcome of his trial would have been different had counsel used these alleged prior inconsistent statements. The jury was aware that Dustin Hayes had given prior statements to police where he originally did not implicate Petitioner but apparently still credited Mr. Hayes trial testimony. Petitioner has not shown that if counsel had specifically introduced these statements that the outcome of his trial was substantially likely to have changed. Accordingly, Petitioner is not entitled to relief on this claim.

### E. Failed to request jury instructions of facilitation and solicitation

Petitioner alleges that trial counsel was ineffective for failing to request jury instructions on the "lesser-included offenses" of facilitation and solicitation [Doc. 1 p. 16]. Respondent in turn alleges that this claim is meritless [Doc. 10 p. 50-51]. The Court agrees with Respondent.

The jury instructions used at Petitioner's trial included instructions on second-degree murder, aggravated assault, reckless homicide, reckless aggravated assault, criminally negligent homicide, assault, and reckless endangerment as lesser-included offenses for first-degree felony murder [Doc. 7-8 p. 56-89]. As lesser-included offenses for Petitioner's attempted especially aggravated robbery, the court included instructions on attempted aggravated robbery, aggravated assault, attempted robbery, attempted aggravated assault, reckless aggravated assault, assault,

attempted assault, and attempted theft [*Id.*]. Pursuant to Tennessee law, the jury was instructed to consider the offenses in the order they had been presented and to only consider lower offenses if it acquitted Petitioner of the previous offenses [*Id.*].

At Petitioner's post-conviction hearing, trial counsel testified that he reviewed the standard jury instructions before trial and acknowledged that he did not discuss these instructions with Petitioner. *Cosper II*, 2021 Tenn. Crim. App. LEXIS 30, at *7. He agreed that the instructions did not include, nor did he request inclusion of, a charge for facilitation or solicitation. *Id.* Counsel stated that he did not believe there was a basis for doing so. *Id.*

On post-conviction appeal, the TCCA held that Petitioner was not prejudiced by this issue and thus did not receive constitutionally ineffective assistance of counsel. *Id.* at *27. The court found that the trial court instructed the jury regarding various lesser-included offenses and also stated, "[i]f you find the defendant guilty beyond a reasonable doubt of a listed offense, then you must return a verdict and must not consider or attempt to reach a verdict on any other offense below it on the list." *Id.* In essence, while the trial court included instructions on lesser-included offenses, it likewise indicated that the jury should not attempt to reach a verdict on those if Petitioner were found guilty of a more severe offense. The TCCA found then that it must presume that the jury followed these instructions and that even if instructions on facilitation and solicitation were supported and included, that the jury would not have considered them as it found Petitioner guilty of the charged offenses. *Id.*

The TCCA's decision was not in violation of *Strickland v. Washington* and the Court does not find that counsel was otherwise ineffective, because Petitioner has not demonstrated prejudice. To demonstrate prejudice, Petitioner would have to demonstrate that counsel's decision acted to his substantial disadvantage. Petitioner's jury was instructed to consider lower offenses only if it

25

did not find guilt as to the indicted offenses. Accordingly, even if counsel had requested the instructions and the court had granted the request, given that Petitioner was convicted of the indicted offenses, there is no reasonable likelihood that the inclusion of lower offenses would have affected the outcome of Petitioner's trial. Petitioner is not entitled to relief on this claim.

### F. Failed to call alibi witnesses

Petitioner claims that counsel was ineffective for failing to call alibi witnesses proposed by Petitioner [Doc. 1 p. 16]. Respondent contends that this claim lacks merit [Doc. 10 p. 52-53]. The Court agrees that Petitioner is not entitled to relief.

At Petitioner's post-conviction hearing, trial counsel stated that Petitioner's prior counsel had interviewed potential alibi witnesses and indicated that he could not piece an alibi together; when counsel sought to verify this by interviewing witnesses himself, he agreed that there was no alibi and decided not to present the suggested witnesses. *Cosper II*, 2021 Tenn. Crim. App. LEXIS 30, at *10.

> Trial counsel said that he interviewed potential alibi witnesses, including Blake Lee, Marcus Lee, and Heaven Wilson. He discussed the alibi with the petitioner and filed a notice of an alibi defense. Counsel explained, however, that after several interviews with the potential witnesses, he was unsuccessful in "piec[ing] together an alibi" because "there were holes in the time frame around when [the offenses] occurred." He said that he explained the matter to the petitioner and that he would have raised an alibi defense if he thought that the evidence supported one.

*Id.*

Ms. Wilson also testified at Petitioner's post-conviction hearing about the day of the offenses. Ms. Wilson, who was Blake Lee's sister, indicated that at the time she was 15 years old and lived with her mother and brothers. *Id.* at *12. She agreed that Petitioner had spent the night before the shooting at her house, was there when she woke up, and spent the day with her, but that

he left "around nightfall" with her sister, Brittany Moody, but not with Mr. Hayes. *Id.* at *13. She said that she told this information to petitioner's attorney before trial but did not speak to the police. *Id.* She was not subpoenaed and did not attend Petitioner's trial. *Id.* at *14.

Petitioner testified at this hearing that he had provided three potential alibi witnesses, but that counsel indicated that he "might not want to use them" because two of them were not with him throughout the day. *Id.* at *15. While petitioner conceded that he left Ms. Wilson's house "late in the day," he argued that counsel never indicated that his "alibi was shaky" and did not indicate he was not going to call Ms. Wilson as a witness. *Id.* at *16. Contradictory to Mr. Hayes's previous testimony, and Ms. Wilson's, Petitioner said that he left Ms. Wilson's house with Mr. Hayes, Ms. Brittany Moody, and Ms. Moody's brother to go downtown. *Id.*

On post-conviction appeal, the TCCA found that the post-conviction court specifically accredited trial counsel's testimony over that of Ms. Wilson and the Petitioner. *Id.* at *25. As counsel indicated that despite interviewing witnesses he could not piece together an alibi, the TCCA found that counsel did not perform deficiently. *Id.* at *25-26.

Generally, habeas courts defer to trial court credibility findings, as the trial court is in the best position, having observed the demeanor of witnesses, to make such determinations. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003); *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). Here, the trial court, and by extension the TCCA, specifically credited counsel's testimony. Absent evidence "too powerful to conclude anything" other than the unreasonableness of the trial court's finding, the Court will not upset this credibility determination. *See Miller-El v. Dretke*, 545 U.S. 231, 265 (2005). Accordingly, the Court will not second-guess the trial court's decision or counsel's decision not to present a witness who he did not believe could adequately support Petitioner's alibi claim.

### G. Jury Instructions

Petitioner claims that trial counsel was ineffective for failing to request either a mistrial or a curative instruction when an erroneous charge was mentioned during preliminary jury instructions [Doc. 1 p. 16]. Respondent claims that Petitioner is not entitled to relief on this claim [Doc. 10 p. 54-55]. The Court agrees that this claim lacks merit.

While Petitioner's indictment originally included a charge for conspiracy, this charge was dropped before trial [Doc. 7-1 p. 7]. During the initial jury instructions to the jury venire, the trial court stated "the indictment in this case charges the defendant with three crimes . . . felony murder, . . . especially aggravated robbery; and conspiracy to commit aggravated robbery" [Doc. 7-3 p. 10]. During voir dire, trial counsel also mentioned that Petitioner "was charged with felony murder, conspiracy to commit aggravated robbery, and the attempted especially aggravated robbery" [Doc. 7-4 p. 5]. Later, after the jury was sworn and the indictment had been read, the court alerted the parties, outside of the jury's hearing, that the conspiracy charge had been mentioned [*Id.* at 63]. Counsel declined to have the State dismiss the charge in open court as he did not wish to draw further attention to it [*Id.* at 64].

At post-conviction hearings trial counsel testified:

> that on the day of the trial, the State informed him that it would not pursue a conspiracy charge which comprised count three of the indictment; however, before the State dismissed the charge, the jury had already received preliminary instructions, including reference to the conspiracy charge. Counsel acknowledged that he did not object to the inclusion of the conspiracy charge in the preliminary instructions, nor did he request a curative instruction.

*Cosper II*, 20212 Tenn. Crim. App. LEXIS 30, at *8.

The post-conviction court found that while instructing the jury not to infer anything from the removal of the charge would have been appropriate, a mistrial was not necessary, and it was

not unreasonable for the parties to agree not to remind the jury about the charge [Doc. 7-19]. On post-conviction appeal, the TCCA affirmed, holding that Petitioner could not show he was prejudiced by trial counsel's failure to object to or request a curative instruction on this issue. *Id.* at *28-29. The TCCA noted that the trial court twice instructed the jury that the indictment was not evidence, and under Tennessee law the jury was presumed to have followed that instruction. *Id.* at *29.

The state court's holding was not contrary to or an unreasonable application of federal law, nor was it based on an unreasonable factual finding. Counsel had a strategic reason for not further referencing the dropped charge. Even if counsel could be proved deficient, Petitioner has not demonstrated prejudice. To do so, Petitioner would have to prove that a request for mistrial on these grounds would have likely been granted or that such a curative instruction would have changed the outcome of his trial on his remaining two charges. Petitioner has not offered, nor can the Court find, proof that it is likely that a mistrial would have been granted on these de minimis grounds. As to Petitioner's claim regarding curative instructions, the jurors were already instructed not to consider the indictment against Petitioner as evidence; Petitioner has offered no evidence that a repetitive instruction to ignore reference to the indictment would have impacted the outcome of his trial. *Cf. Frazier v. Scutt*, 2011 U.S. Dist. LEXIS 130317, at *25 (E. D. Mich. Nov. 10, 2011) ("In light of the fact that any curative instruction would have been repetitive of the trial judge's final instruction . . . counsel's failure to request a curative instruction was not ineffective assistance of counsel."). As there is a reasonable argument that counsel satisfied *Strickland's* deferential standard, Petitioner is not entitled to relief. *See Harrington v. Richter*, 562 U.S. at 105.

### H. Co-Defendant's Nickname

At trial, Petitioner's co-defendant, Devonte Stoudemire, was frequently referred to by his nickname or alias, "White Chalk," even by Petitioner's counsel. Petitioner claims that trial counsel was ineffective for failing to object to the use of this nickname at trial [Doc. 1 p. 16]. Respondent, however, contends that this claim lacked merit as Petitioner can demonstrate neither deficiency nor prejudice [Doc. 10 p. 55-56]. The Court agrees with Respondent.

Counsel said he did not object to the nickname "White Chalk," which he had inferred referred to the white chalk used to mark bodies at homicide scenes because he had no "problem with there being some other bad actor in the picture." *Cosper II*, 2021 Tenn. Crim. App. LEXIS 30, at *11-12.

> Trial counsel acknowledged that he did not move to exclude reference to Mr. Stoudemire's nickname, "White Chalk," which name was used throughout the trial. He stated that he considered such a motion but ultimately decided against it because he thought it could be helpful to have someone with an incriminating-sounding name that "we could potentially point to as the person who did it." Counsel said that he was familiar with Mr. Stoudemire and understood his nickname to be "based off of his reputation" and a reference to the white lines drawn by investigators at the scene of a homicide to indicate the victim's location.

*Id.* at *8-9.

Petitioner raised this claim to the post-conviction court and on his subsequent appeal [Doc. 7-23 p. 24-25]. The post-conviction court noted that while the reference "arguably . . . reflected poorly on the petitioner's choice of associate," prejudice was "negligible" given both Petitioner's and Mr. Stoudemire's role in this offense [Doc. 7-19]. The TCCA held that Petitioner was not entitled to relief on this claim and credited counsel's testimony that while he considered filing a motion to exclude reference to this nickname, he ultimately decided it would be beneficial to have a person with an incriminating name to potentially point to as the perpetrator. *Id.* at *24. The TCCA

accordingly found that this was the type of reasonable, strategic decision that was not proper for the court to second-guess. *Id.* at *23-24.

Given the deferential lens applied to both habeas claims and claims of ineffective assistance of counsel, the Court again cannot find that the TCCA's holding was objectively unreasonable. The state court accredited trial counsel's testimony that he had a strategic reason for choosing not to object to the use of Mr. Stoudemire's nickname and appropriately held that this was not then the sort of decision for the court to second-guess. Further, there is no evidence, and Petitioner has provided no argument, that reference to Mr. Stoudemire's nickname prejudiced Petitioner in any way. Given the testimony establishing Petitioner's behavior on the days surrounding the shooting, the jury was clearly made aware that Petitioner associated himself with people who committed crimes. It is unclear how this specific nickname may have been notably prejudicial. Accordingly, this claim lacks merit.

## I.    Failed to object to improper closing arguments

Petitioner claims that trial counsel was ineffective for failing to object to improper or inflammatory language used during the prosecutor's closing argument [Doc. 1 p. 16]. Respondent argues that there is neither deficient performance nor prejudice here [Doc. 10 p. 56-58]. The Court agrees with Respondent.

During closing arguments, in reference to the agreement it entered with Petitioner's co-defendant, the State argued that its "job [was] to prosecute the most dangerous offenders there are," including "murderers like the defendant, rapists, kidnappers, armed robbers like the defendant," with whom "agreements have to be made," which "the State doesn't necessarily like." *Cosper II*, 2021 Tenn. Crim. App. LEXIS 30, at *9. This language was apparently used to reference the deal the State made with Petitioner's co-defendant Dustin Hayes. *Id.*

31

Trial counsel acknowledged that he did not object to the prosecutor's statement in closing argument that "'our job is to prosecute the most dangerous offenders . . . and sometimes, in order to prosecute those individuals, murderers like the defendant, rapists, kidnappers, armed robbers like the defendant, agreements have to be made. . . . because it's important that murderers and robbers like the defendant are taken off the street[.]'" Counsel stated that, "upon reflection, I believe it [wa]s objectionable" because it was "overtly prejudicial," noting that, at that time, the petitioner had not yet been convicted of murder or robbery and was not charged with rape or kidnapping. Counsel also stated that he believed it was possible for a prosecutor to "over-sell[ ] a case" by using that sort of "over the top" language and that "to some extent . . . you have to trust your jurors to . . . not be swayed by mere rhetoric." He said that in his closing argument, he asked the jury to consider the evidence fairly and to "not be swayed by the emotions of it." Trial counsel admitted that he did not raise the matter on direct appeal "[b]ecause I didn't think of it." He continued: "[M]y view is that a defense attorney should not object to everything that is objectionable, and . . . . I did not see that as an issue."

*Id.*

The post-conviction trial court held that there was sufficient evidence of Petitioner's role in the victim's death to explain the State's closing argument and that it would have been apparent to the jury then, as it was to the court, that the prosecutor was referencing the State's theory of the case, that Petitioner took the lead role in this offense [Doc. 7-19]. It then found no deficiency and no prejudice [*Id.*].

On post-conviction appeal, the TCCA found that counsel's decision was a reasonable, strategic decision that it declined to second-guess. *Id.* at *24. "Believing that a prosecutor's "over the top" language can be counterproductive to the State, trial counsel chose to forgo an objection and, instead, argued for the jury to set aside their emotions." *Id.*

Counsel's effectiveness turns not on whether counsel made the decisions the Court would have made, but rather whether counsel's performance fell outside the "wide range of professionally competent assistance." *Strickland*, 466 U.S. at 688. Here, counsel's decision to not object, believing that the prosecutor was overselling his case, was not objectively unreasonable. From the

context provided by the post-conviction trial court, it seems that these statements were not merely an attempt to label petitioner, but rather presenting the state's theory of the case. Moreover, the jury was also instructed not to consider closing arguments as evidence, so any prejudice to Petitioner was minimized. On habeas review, the court analyzes whether there was any reasonable argument that counsel satisfied *Strickland's* deferential standard. The Court agrees that counsel's performance satisfies that standard and that Petitioner is not then entitled to relief.

### J. Cumulative impact

Petitioner also argues that the cumulative impact of counsel's errors deprived Petitioner of a fair trial [Doc. 1 p. 17].[6] While Petitioner did argue in his appellate brief below that "the cumulative effect of all of the multiple deficiencies cannot be found to be harmless in this case" [Doc. 7-3 p. 28], the TCCA did not expressly address this argument. Even assuming that cumulative impact relief is available for ineffective assistance of counsel claims, Petitioner would still not be entitled to relief. As the Court has rejected each of Petitioner's claims of ineffective assistance of counsel, it likewise rejects Petitioner's claim that he was prejudiced by the cumulative impact of alleged errors. *See Stojetz v. Ishee*, No. 2:04-cv-263, 2014 U.S. Dist. LEXIS 137501, at *179-80 (S.D. Ohio Sept. 24, 2014) (noting that "because the sum of various zeroes remains zero," the combined effect of counsel's alleged errors does not warrant relief).

### IV. CONCLUSION

For the reasons set forth above, Petitioner's petition for a writ of habeas corpus [Doc. 1] will be **DENIED,** and this action will be **DISMISSED**.

---

[6] Petitioner correctly did not argue cumulative error as its own claim, but rather pleads the cumulative impact of counsel's errors prejudiced his trial.

## V. CERTIFICATE OF APPEALABILITY

The Court must now consider whether to issue a certificate of appealability ("COA"), should Petitioner file a notice of appeal. Under 28 U.S.C. § 2253(a) and (c), a petitioner may appeal a final order in a habeas proceeding only if he is issued a COA, and a COA may only be issued where a Petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on a procedural basis without reaching the underlying claim, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the court dismissed a claim on the merits, but reasonable jurists could conclude the issues raised are adequate to deserve further review, the petitioner has made a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell*, 537 U.S. 322, 327, 336 (2003); *Slack*, 529 U.S. at 484. Reasonable jurists would not disagree that Petitioner's counsel was not ineffective and that Petitioner was not entitled to habeas relief. Accordingly, a **COA SHALL NOT ISSUE.**

**AN APPROPRIATE ORDER WILL ENTER.**


*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**